953 So.2d 702 (2007)
Marcelino L. ALVAREZ, M.D., Appellant/Cross-Appellee,
v.
Susan M. RENDON, M.D., Individually, et al., Appellee/Cross-Appellant.
No. 5D05-4361.
District Court of Appeal of Florida, Fifth District.
April 5, 2007.
*704 Darryl M. Bloodworth and Nichole M. Mooney, of Dean, Mead, Egerton, Bloodworth, Capouano & Bozarth, P.A., Orlando, for Appellant/Cross-Appellee.
William G. Osborne, of William G. Osborne, P.A., Orlando, and Barry Burnette, of Keedy & Burnette, P.A., Tavares, for Appellee/Cross-Appellant.
GRIFFIN, J.
Dr. Marcelino L. Alvarez ["Dr. Alvarez"] appeals the Final Judgment awarding Pathology Medical Laboratories, P.A. ["PML"] a net judgment of $602,970.48.[1] *705 We conclude that the trial court erred in refusing to order a new trial and reverse.
In 2001, Drs. Alvarez and Rendon formed PML, a professional association, for the purpose of practicing medicine in the field of pathology. Dr. Rendon owns 51% of PML's outstanding shares, and Dr. Alvarez owns the remaining 49% of shares. After the company was formed, Dr. Alvarez executed an employment agreement with PML. Under the terms of this agreement, PML could terminate Dr. Alvarez with or without cause. The contract enumerates the events that may give rise to "for cause" termination. The agreement also provides that, if PML terminates Dr. Alvarez "without cause," PML would have to give Dr. Alvarez sixty days' written notice and provide Dr. Alvarez his basic compensation during the period.
Subsequently, Dr. Alvarez, Dr. Rendon, and PML entered into a Buy-Sell Agreement. Under the terms of the Buy-Sell Agreement, if the employment of a share-holding employee ended for any reason, PML had the right to purchase the employee's stock for a specified price. The price at which PML would have to pay to purchase the departing employee's shares depended on the reason for the termination of employment. If the employee ended his employment voluntarily or was terminated for cause, the purchase price would be $500 per share. If the employee's employment was terminated by PML without cause, PML or the remaining shareholders would have to pay $1,000 per share to purchase the shares. The Buy-Sell Agreement included a non-compete provision that would become effective upon redemption of the shares.
In a letter dated October 31, 2003, Dr. Rendon, ostensibly acting in her capacity as president of PML, terminated Dr. Alvarez' employment "for cause" under the terms of his employment agreement. Further, the termination letter stated that PML was electing to purchase Dr. Alvarez' 490 shares in the company under the terms of the Buy-Sell Agreement. Subsequently, PML attempted to begin making payments to purchase Dr. Alvarez' 490 shares for $245,000. However, Dr. Alvarez declined to sell his PML shares for $245,000, asserting that he was improperly terminated "for cause" and, thus, was entitled to $490,000 for his stock.
After Dr. Alvarez left PML, he began working as an independent contractor with Broward Medical Laboratories ["BML"], which is located in South Florida. BML collects tissue samples from all parts of Florida, including the geographic area specified in the non-compete. The collected samples are sent to BML and processed into slides. Under his relationship with BML, Dr. Alvarez then would receive slides from BML, read them, interpret them, and create a written report containing his diagnosis. Dr. Alvarez performed this work for BML either in his home or at the offices of BML, both of which are located outside the geographic region encompassed in the non-compete. After PML terminated his employment, Dr. Alvarez called some of PML's clients to see if they would be interested in his continued services. Of the BML clients located in Lake County for whom Dr. Alvarez subsequently read slides, most were former PML clients.
In his Second Amended Complaint, Dr. Alvarez brought three claims. First, Dr. Alvarez claimed that PML breached his employment contract by improperly terminating him for cause and improperly reducing his salary prior to termination. Second, Dr. Alvarez brought a claim against PML for breach of the Buy-Sell Agreement, because it failed to tender the required stock purchase payment within the time and under the terms required by *706 that agreement. Third, Dr. Alvarez brought an action against Dr. Rendon for beach of the Buy-Sell Agreement, because she breached paragraph 3.4 of the agreement when she failed to purchase Dr. Alvarez' shares for the proper amount, after PML breached its obligation to do so.
In response, Dr. Rendon and PML brought three counterclaims. First, they claimed that Dr. Alvarez breached the non-compete provision of the Buy-Sell Agreement by soliciting or otherwise obtaining and performing work for several former, present, or prospective PML clients while working at BML. Second, they claimed that Dr. Alvarez violated the Florida Unfair and Deceptive Trade Practices Act by engaging in unfair methods of competition. Third, they brought a claim for injunctive relief against Dr. Alvarez both for breach of the non-compete and alleged unfair and deceptive trade practices.
On June 15, 2005, Dr. Alvarez filed a motion for partial summary judgment to establish that, even if the non-compete were enforceable, his activity did not violate the terms of the non-compete. In an order filed July 19, 2005, the trial court denied Dr. Alvarez' motion based on the conclusion that "the provisions of the parties' agreement (3.6) are too ambiguous for the court to grant either parties' Motion for Summary Judgment as currently presented."
At a subsequent motions hearing, PML and Dr. Rendon argued a motion in limine to exclude references to Dr. Rendon's alcoholism or rehabilitation treatment for alcoholism, because such references would be unduly prejudicial. At the hearing, the trial judge granted the motion, concluding that Dr. Alvarez' stated reason for seeking introduction of the evidence could be addressed by allowing Dr. Alvarez to reference Dr. Rendon's rehabilitation as "medical leave."
A four-day jury trial was held on all claims. In its verdict, the jury found that PML breached Dr. Alvarez' employment contract by firing him for cause, and awarded Dr. Alvarez $245,123 in damages on that claim. The jury also found that PML, but not Dr. Rendon, breached the Buy-Sell Agreement and awarded Dr. Alvarez $490,000 on that claim. However, the jury also found that Dr. Alvarez breached the non-compete contained in the Buy-Sell Agreement and awarded PML $1,429,731 on its counterclaim. Upon receipt of the verdict, the trial court raised the issue of inconsistency in the verdict and the following exchange occurred:
Counsel for Dr. Rendon: Yes, sir. I think it's consistent.
The Court: That's what I'm looking for, I'm sorry.
Counsel for Dr. Alvarez: Well, I must say, your Honor, I think it is inconsistent. Because if they violated for cause they didn't tender the correct price that the jury has found, we believe that there is a first breach, and therefore should not take place.
The Court: It's not so obvious thatI mean, I don't know if you can correct it.
Counsel for Dr. Alvarez: I don't think it is anything you can take up with the jury.
Counsel for Dr. Rendon: I don't think the jury can do anything about it.
The Court: I don't think I canor I can't with the jury at this time do anything about it. I think we've got it done, in one sense, a done deal. All right, bring them back in.
After the jury verdict, PML asked the trial court to enter a permanent injunction restraining Dr. Alvarez from committing *707 any of the acts set forth in Paragraph 3.6 of the Buy-Sell agreement, between the time of the jury verdict on September 29, 2005 and December 20, 2007. The trial court entered the permanent injunction and awarded PML a net judgment in the amount of $602,970.48.
Dr. Alvarez then filed his motion for Judgment in Accordance with the Motion for Directed Verdict or for Judgment Notwithstanding the Verdict and Alternative Motion for New Trial and Motion for Remittitur. In an order filed on December 6, 2005, the trial court declined to grant any of these motions. Both parties also brought motions for attorneys' fees and costs. In an order dated December 8, 2005, the trial court declined to grant fees to either party.
We conclude that the verdict reached by the jury in this case was legally impossible and was the product of a combination of errors.
Under the terms of the Buy-Sell Agreement, if the employment of a shareholding employee is terminated for any reason, that employee is deemed to have made an offer to sell their shares of stock in PML to the company and the other shareholders on the date of termination. Once this offer is made, the Corporation can elect to purchase all of the employee's stock by giving notice. This notice must specify a date for closing that is not more than thirty days later than the date of the notice. The purchase price depends on whether the employee is terminated with or without cause.
The October 31, 2003 letter from Dr. Rendon to Dr. Alvarez stated that Dr. Alvarez' employment was being terminated for cause, pursuant to the terms and conditions of his employment agreement. The letter further stated that "[t]his letter . . . constitutes notice pursuant to paragraph 1.4 of the Buy-Sell Agreement dated December 20, 2002 that the P.A. intends to exercise its right to redeem your four hundred ninety (490) shares of P.A. stock, payable over sixty (60) monthly installments as provided for therein."[2]
In a letter written on November 4, 2003, Dr. Alvarez' lawyer, Robert Mead, informed PML's lawyer, Bill Cauthen, that Dr. Alvarez vigorously contested that he was properly terminated for cause. This letter further stated:
Finally, I want to let you know that we have advised Dr. Alvarez that the restrictive covenant contained in the Buy-Sell Agreement is not enforceable because the thirty mile radius is far too broad and, more importantly, the five year period is significantly in excess of the two year maximum that follows the termination of an employment relationship under Florida Statute 542.335. Just so Dr. Rendon understands, our client has no intention of leaving the Leesburg area.
In a letter dated December 15, 2003, attorney Cauthen set forth PML's position:
The P.A. is ready, willing and able to honor its commitment to redeem Dr. Alvarez' stock for $245,000, payable in sixty (60) equal installments, plus interest at four percent (4%).
To date, I understand that your client has refused to discuss the issues necessary to set a formal closing date.
Therefore, pursuant to the terms and conditions of the applicable Buy-Sell Agreement ("Agreement"), enclosed is the first monthly installment payment and a Promissory Note with amortization schedule evincing the applicable indebtedness guaranteed by Dr. Rendon *708 pursuant to Section 3.4 of the Agreement."
Dr. Alvarez declined to deliver the endorsed stock certificates because the payment amount was half of what it ought to be and was calculated using an incorrect rate of interest.
At trial, Dr. Alvarez made it clear that he would not have agreed to close on the sale of the stock for $245,000, but that he would have closed for what he considered the proper amount$490,000. Similarly, Dr. Rendon indicated at trial that she knew Dr. Alvarez wanted $490,000, but that she wasn't going to relent on termination for cause. Even though the Buy-Sell Agreement is explicit that it does not become effective until Dr. Alvarez' shares are redeemed, PML argued that redeeming the shares would have been "futile," and was therefore excused, in light of the November 4 letter from his counsel. This case was considerably complicated by, and ultimately went off the rails because of Dr. Rendon's contention that she could be excused from tendering Dr. Alvarez the correct amount owed him and still enforce the non-compete agreement. At the conclusion of PML's case on the non-compete, and then at the conclusion of all evidence, Dr. Alvarez made a motion for directed verdict "on the basis that his shares of PML stock had never been redeemed as required and the condition precedent to enforcement of the non-compete provision failed." These motions were denied.
After the verdict, in which the jury found he had been wrongfully terminated for cause but yet had violated the non-compete, Dr. Alvarez filed a motion for Judgment in Accordance with the Motion for Directed Verdict or for Judgment Notwithstanding the Verdict and Alternative Motion for New Trial. The trial court declined to grant any of these motions.
On appeal, Dr. Alvarez argues that because the jury found that he was improperly terminated for cause and was entitled to damages for breach of the employment and Buy-Sell Agreement, the condition precedent for enforcement of the non-compete was never met, so he is entitled to have "the jury's verdict in favor of PML on its counterclaim for breach of the non-compete set aside and judgment entered in his favor or, in the alternative, remanded for a new trial." It appears to be undisputed on appeal that the enforcement of the non-compete was conditioned on the purchase of Dr. Alvarez' stock. It also appears to be undisputed that neither PML nor Dr. Rendon ever tendered the "without cause" amount to purchase Dr. Alvarez' shares. PML does not challenge on appeal the adverse verdict on the employment claim and Buy-Sell Agreement. The fundamental dispute is over the question whether the condition precedent was excused by "futility." On appeal, PML has recast this as Dr. Alvarez' anticipatory breach of the contract.
I. THE DUTY TO TENDER THE CORRECT PURCHASE PRICE WAS NOT EXCUSED.
A condition precedent has been defined as one which calls for the performance of some act, or the happening of some event after a contract is entered into, upon the performance or happening of which its obligation to perform is made to depend. Cohen v. Rothman, 127 So.2d 143, 147 (Fla. 3d DCA 1961). "[T]here must be at least a substantial performance of conditions precedent in order to authorize a recovery as for performance of a contract." Id.
Under the doctrine of futility, a party may be excused from performing a condition precedent to enforcement of the contract, if performance of the condition *709 would be futile. See Waksman Enters., Inc. v. Oregon Props., Inc., 862 So.2d 35, 43 (Fla. 2d DCA 2003) ("[T]he law does not require that a party to a contract take action that would clearly be futile").
Also, under some circumstances, the anticipatory beach of a contract by one party may excuse the other party from performing a condition precedent to that contract. An anticipatory breach of contract occurs before the time has come when there is a present duty to perform as the result of words or acts evincing an intention to refuse performance in the future. While anticipatory repudiation obviates the requirement that the conditions be performed, it does not obviate the requirement that they be performable.
In Hospital Mortgage Group v. First Prudential Development Corp., 411 So.2d 181, 182 (Fla.1982), Florida's supreme court held that "[t]he holder of the duty based upon a condition precedent cannot profit from an anticipatory repudiation of a contract that he would have breached himself. It follows that if performance of the condition precedent is excused the ability to perform them must still be shown." In explaining this conclusion, the court quoted the following passage from 4 A. CORBIN, CONTRACTS § 978 (1951):
In an action for breach by an unconditional repudiation it is still a condition precedent to the plaintiff's right to a judgment for damages that he should have the ability to perform all such conditions. If he could not or would not have performed the substantial equivalent for which the defendant's performance was agreed to be exchanged, he is given no remedy in damages for the defendant's non-performance or repudiation. Of course, the willingness and ability that remains a condition precedent in spite of the defendant's repudiation, is willingness and ability to perform if there had been no repudiation. The defendant's wrongful repudiation justifies the plaintiff in taking him at his word and at once taking steps that may make subsequent performance impossible. The willingness and ability to perform need not continue after the repudiation; it is merely required that they should have existed before the repudiation and that the plaintiff would have rendered the agreed performance if the defendant had not repudiated.
Hosp. Mortg. Group, 411 So.2d at 182. Thus, if PML had been unwilling, prior to Dr. Alvarez' alleged repudiation, to perform the condition precedent to enforcement of the non-compete, it could not recover for Dr. Alvarez' alleged anticipatory breach. Here, it is undisputed that PML refused to offer $490,000 for the stock but did offer $245,000. Thus, as a matter of law, if PML were obliged to pay $490,000, as the jury found, it was required to make that tender.
We also conclude that under no view of the evidence could the letter from Dr. Alvarez' counsel be an anticipatory repudiation of the Buy-Sell Agreement. It was a legal response to the decision of Dr. Rendon to fire Dr. Alvarez for cause and to tender only the "for cause" redemption price. The letter simply cannot be read to reject performance of the non-compete after the purchase of his shares for $490,000. See RESTATEMENT (SECOND) OF CONTRACTS § 250 cmt. b. (1970). Indisputably, the "without cause" purchase price of $490,000 was never offered. The jury never should have been allowed to consider whether the letter sent by counsel for Dr. Alvarez could excuse tender of the $490,000 as a predicate for enforceability of the non-compete agreement.
Seemingly, this should not have been a difficult case for the jury to decide. *710 Was PML justified in firing Dr. Alvarez for cause? If so, his compensation was limited to $245,000. There was no formal closing on the sale of the stock because Dr. Alvarez refused to participate in a closing for $245,000. To this extent only, PML's "futility" argument has merit. Upon proper tender of the correct redemption amount, Dr. Alvarez would be bound by the non-compete provision of the Buy-Sell Agreement.
If the jury found that the correct sum had been properly tendered, the jury would then have to determine if the non-compete agreement meant what PML said it meant or what Dr. Alvarez contended it meant. According to PML, the non-compete prohibited Dr. Alvarez from performing work on behalf of another company so long as the clients were within the area covered. Dr. Alvarez contended that the non-compete only limited where he could perform his work, and in any event, the non-compete did not proscribe solicitation.
If the jury found that Dr. Alvarez had been wrongly fired for cause, this would have two important consequences: first, he would be entitled to damages, including lost compensation under the employment agreement and $490,000 for his stock. Second, he could not have been in violation of the non-compete provisions of the Buy-Sell Agreement because the condition giving rise to the duty not to compete, i.e., the tender of $490,000 to redeem his stock, never occurred.
Whether proper performance was the tender of $245,000 or $490,000 depends on whether PML was justified in terminating Dr. Alvarez for cause. The jury answered this question in the negative. However, in the same verdict form, the jury concluded that Dr. Alvarez breached the non-compete and awarded PML damages for that breach. The inconsistency arises because, for the jury to find that Dr. Alvarez breached the non-compete, it had to reject Dr. Alvarez' defense that PML failed to purchase his stock as required by the agreementwhich is precisely what the jury found in the preceding part of the verdict form had happened.
It is not clear why the jury reached these two legally inconsistent conclusions. Perhaps, in part, it was the jury instructions, which in this case, were awful. They are confusing, inconsistent, and incorrect. This was not entirely the fault of the trial judge because these instructions, inexplicably, were the product of a stipulation. The jury's plight was made worse by the design of the verdict form, which failed to let the jury know that if it concluded that PML had wrongly discharged Dr. Alvarez for cause, then it was not to consider the non-compete issue.
II. WHAT TO DO WITH THE INCONSISTENT VERDICT?
An inconsistent verdict arises in the following circumstances:
Where the findings of a jury's verdict in two or more respects are findings with respect to a definite fact material to the judgment such that both cannot be true and therefore stand at the same time, they are in fatal conflict. In such circumstances, contradictory findings mutually destroy each other and result in no valid verdict, and a trial court's judgment based thereupon is erroneous.
Crawford v. DiMicco, 216 So.2d 769, 771 (Fla. 4th DCA 1968). "To preserve the issue of an inconsistent verdict for review on appeal, the party claiming inconsistency must raise the issue before the jury is discharged." Deklyen v. Truckers World, Inc., 867 So.2d 1264, 1266 (Fla. 5th DCA 2004).
This court has said that a new trial is the proper remedy for an inconsistent verdict *711 on appeal. In Southland Corp. v. Crane, 699 So.2d 332, 334 (Fla. 5th DCA 1997), the jury found that plaintiff's injuries were the result of both her own and defendant's negligence. Then, in the same verdict form, it found the defendant 100% at fault and the plaintiff 0% at fault. This court stated:
This court has not hesitated to reverse a judgment where the jury's verdict reflects findings patently in conflict.
In the instant case, the verdict is clearly contradictory in that the jury found negligence on the part of the plaintiff which was a legal cause of her damage but then proceeded to apportion all of the negligence to the defendant. There is simply no way to square the verdict or to determine the intent of the jury. A new trial is required on all issues.
Southland, 699 So.2d at 334 (citations omitted); see also MSM Golf, L.L.C. v. Newgent, 853 So.2d 1086, 1087 (Fla. 5th DCA 2003) ("While this rule sounds in discretionary language, it seems to us that once the trial court specifically recognized the patent inconsistency of the verdict, it was the court's obligation to order a new trial"); see also Mike Henry, Inc. v. Donaldson, 558 So.2d 1093, 1095 (Fla. 5th DCA 1990) (Trial court found that when jury verdict evidences that the "the jury misunderstood the evidence or the instructions or both . . . the court should have granted the motion for new trial").
Southland also explains that whether the proper remedy is a new trial or entry of judgment in one party's favor depends on whether the intent of the jury can be properly determined from the verdict form. This is consistent with the First District Court's explanation in Continental Assurance Co. v. Davis, 538 So.2d 542 (Fla. 1st DCA 1989), which held:
The court can correct verdicts only where it appears that the jury "incorrectly apportioned damages, erroneously transposed the amounts in consolidated action, or made other clerical errors in rendering the verdict. . . . On the other hand if the verdicts were the result of misconceptions of the jury as to the facts and law involved, or confusion, and do not reflect the true intent of the jury," then the court cannot correct the verdict.
Id. at 543 (citing Cory v. Greyhound Lines, Inc., 257 So.2d 36, 40 (Fla.1971)).
In support of the verdict, PML makes two arguments. First, PML argues that Dr. Alvarez failed to properly object to the alleged inconsistency in the jury's verdict prior to the discharge of the jury, and is, thus, "foreclosed from now arguing that the verdict is inconsistent and a new trial is required." Second, PML continues to argue that the jury's finding is not inconsistentthat while the jury may have found that PML breached its obligation under the Buy-Sell Agreement, the jury could still find that the non-compete was enforceable, because performance of the condition precedent would have been futile or because Dr. Alvarez anticipatorily breached his obligations under the Buy-Sell Agreement.
We conclude that Dr. Alvarez adequately preserved this issue for appellate review by raising the issue prior to discharge of the jury. Although Dr. Alvarez' counsel agreed with the trial judge that the verdict could not be fixed by resubmitting it to the jury to correct the inconsistency, he did explain its nature. Counsel for PML took the position that there was no inconsistency. Besides, after reading this record, including the closing arguments, the jury instructions and the verdict form, we cannot envision what flash of insight could have led that hapless jury to a proper verdict.
*712 Without doubt, the key issue in this case is whether Dr. Alvarez was properly terminated for cause and the jury found he was not. However, just because the verdict in favor of Dr. Alvarez came first does not mean it necessarily prevails. In the jury instructions and verdict form the jury was asked to consider each claim separately, so it is impossible to tell what the jury intended or what it would have intended if it had been correctly told what it had to decide. The proper remedy here has to be a new trial.
III. WHETHER THE NON-COMPETE AGREEMENT WAS BREACHED.
Finally, we address the contention that Dr. Alvarez did not, as a matter of law, breach the non-compete agreement, so he is entitled to judgment in his favor, notwithstanding any inconsistency in the verdict. As discussed previously, after Dr. Alvarez left PML, he began working with BML as an independent contractor. In his relationship with BML, Dr. Alvarez would receive slides from BML, read them, interpret them, and create a written report containing his diagnosis. Alvarez asserted that he performed this work for BML either in his home or at the offices of BML, both of which are located outside the geographic region encompassed in the non-compete. Dr. Alvarez apparently also called some portion of his former clients to see if they would be interested in his continued services through BML.
On June 15, 2005, Dr. Alvarez filed a motion for partial summary judgment to establish that, even if the non-compete was enforceable, his activity did not violate the terms of the non-compete. Dr. Alvarez' position on summary judgment was that the terms of the non-compete did not explicitly prohibit solicitation, and his competitive activity was outside the geographic scope of the non-compete. PML's argument below was essentially that, given the nature of the business and the purpose of the non-compete, where Dr. Alvarez is physically located does not matter. What matters is that he was soliciting and/or performing services for customers located within the geographic region of the non-compete.
In part, the non-compete provides:
3.6 No competition. Each Stockholder hereto agrees that upon purchase of Stockholder's shares of stock under this Agreement and for a period of five (5) years after the closing on the Stockholder's stock ("Redeemed Stockholder"), the Redeemed Stockholder shall not, within a thirty (30) mile radius of an office of the Corporation or Leesburg Regional Medical Center, the Villages Tri-County Medical Center, Inc. or at any other hospital which Corporation's physicians actively works, own, manage, operate, control, be employed by, act as an agent for, participate in or be connected in any manner with the ownership, management, operation or control of any business which is engaged in the practice of Pathology or any of its subspecialties which are or may be competitive to the business of the Corporation.
Under section 542.33(2)(a), Florida Statutes (2005):
One who sells the goodwill of a business, or any shareholder of a corporation selling or otherwise disposing of all of her or his shares in said corporation, may agree with the buyer, and one who is employed as an . . . employee may agree with her or his employer, to refrain from carrying on or engaging in a similar business and from soliciting old customers of such employer within a reasonably limited time and area, so long as the buyer or any person deriving title to the goodwill from her or him, and so long as *713 such employer, continues to carry on a like business therein.
Section 542.335(1)(h), Florida Statutes (2005), instructs that:
A court shall construe a restrictive covenant in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement. A court shall not employ any rule of contract construction that requires the court to construe a restrictive covenant narrowly, against the restraint, or against the drafter of the contract. . . .
Given the interpretative mandate of the statute, we agree with the trial court that the meaning of this provision cannot be determined as a matter of law.
Given our conclusion that this case has to be retried, we reverse the judgment and the injunction and remand for a new trial of all issues.[3]
REVERSED and REMANDED.
TORPY and MONACO, JJ., concur.
NOTES
[1] Several interlocutory and post-trial orders are also challenged: Order Denying Plaintiff's and Defendants' Motions for Partial Summary Judgment; order granting defendant's motion in limine; denial of plaintiff's motion for directed verdict; the Order on Post Trial Motions denying Plaintiff's Motion for Judgment in Accordance with the Motion for Directed Verdict or for Judgment Notwithstanding the Verdict and Alternative Motion for New Trial and Motion for Remittitur; and a permanent injunction against Alvarez; and the Order on Motions for Attorney's Fees and Costs that denied fees and costs to Plaintiff as a prevailing party. In a cross-appeal, PML and Dr. Rendon also appeal the trial court's Order on Motions for Attorney's Fees and Costs, which denied fees and costs to Defendant as a prevailing party.
[2] No closing date was specified in the October 31, 2003 letter.
[3] Dr. Alvarez makes one further argument concerning an order restricting his introduction of evidence of Dr. Rendon's alcoholism in order to suggest her loss of business was due to her own fault. We think the judge's handling of this issue was right, given the state of the record.